UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2005 MAR -4  P 2: 51

U.S. DISTRICT COURT
DISTRICT OF MASS.

LOUIS BALESTRACCI, JEAN )
BONVILLE, ANDREW CARR, ROBERT )
COMEAU, LEO CONNELLY, JR., )
JOHN H. CORCORAN, JR., THOMAS )
DEARN, RICHARD ELDREDGE, )
RICHARD FLETCHER, BRIAN )
HAWKESWORTH, BEAUFORD HUNT )
ROBERT LAWRENCE, JOSEPH LOPES, )
DAVID MANN, GARY MEYN, )
RUSSELL NICKERSON, DIANE )
OWENS, ERNEST QUINTIN, DONNA )
RENE, JOSEPH SOCHA, STEPHEN )
WATTS, and DUNSTAN WHITLOCK )
         Plaintiffs )
 )
v. )
 )
NSTAR ELECTRIC & GAS )
CORPORATION )
         Defendant )
_____)

Civil Action No. 04-CV-11103-EFH

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT

This is an action by retired employees of Commonwealth Gas Company (the Company) against its corporate successor, NSTAR Electric and Gas Corporation (NSTAR).[1] The plaintiffs seek relief for an unlawful modification of dental benefits that NSTAR imposed on them, their spouses and eligible dependents. In early 2003 NStar announced that retirees of Commonwealth Gas who were not age 65 as of April 1, 2003 would lose the dental coverage, which had been promised for their lifetimes, when they reached age 65.

---

[1] In August 1999 the parent company of Boston Edison Company, BEC Energy, merged with Commonwealth Energy Systems (COM/Energy) and formed a new company, NSTAR Electric and Gas Corporation.

1

The Court's jurisdiction is based on the Employee Retirement Income Security Act, 29 U.S.C. § 1132, and on the doctrine of pendent jurisdiction.

**Statement of Facts**

1. <u>The 1997 Personnel Reduction Program.</u>  In 1997 Commonwealth Gas Company and Commonwealth Electric Company had merged. It was determined to be necessary to reduce the work force, both management and labor. To accomplish this, without the disruption and ill-will that would result from firing employees, the Company sought to attract employees to retire involuntarily. (PSt ¶ 1)[2] In May 1997 the Company distributed to employees a document entitled "Personnel Reduction Program." (Exhibit A to PSt) The program offered employees severance pay of two and one-half weeks of pay for each of the first ten years of System service and two weeks of pay for each additional full year of System service, up to a maximum of one and one-half times annual compensation of seventy-eight weeks of pay. (PSt Exh. B, page 1) The program document included the following provision concerning health and dental coverage for employees who elected to participate in the Personnel Reduction Program (PRP):

> Health and Dental Insurance Coverage: ...
>
> 3) Employees who were at least age forty (40) and had completed at least twelve (12) full years of System service as of January 1, 1993 and currently meet the "Rule of 75" [meaning years of age and years of service total 75] will be entitled to medical and dental insurance coverage providing they pay ten percent (10%) of the current medical and dental premium until age sixty two (62). At age 62 the Company will pay 100% of the premium.

---

[2] References to paragraphs of Plaintiffs' Statement of Undisputed Facts herein are "PSt ¶ __." References to exhibits in the Statement are "PSt, Exh. __."

2

(PSt, Exh. A, page 2) Based on their years of age and service, plaintiffs Balestracci, Carr, Comeau, Hunt, Quinton, Socha and Whitlock qualified to participate in the 1997 PRP under paragraph 3 above.

Each plaintiff who qualified for health and dental care on retirement under the 1997 PRP met with representatives of the company's human resources to discuss the program. They were each given documents entitled "Information Relative to Employee Benefits Upon Your Retirement Date." (PSt Exh. B) These documents provided personalized information for the employee concerning his/her pension calculations and pension options, his/her savings plan balance, the amount of group life insurance and severance pay plan balance. The document also contained the following provisions concerning health and dental insurance:

HEALTH INSURANCE

A. Medical Insurance
Since you were age 40 and had 12 or more years of employment as of January 1, 1993, you will be covered by the Company sponsored medical insurance plans at your Actual retirement Date until you become eligible for Medicare.. You will pay 10% of the current premium (the premium in effect as opf the first of the year in which you retire) from age 55 to age 62. When you reach age 62, the Company will pay the entire premium.

When you become eligible for Medicare, your primary medical insurance coverage will be through Medicare Part "A" and Part "B". Currently, the Company reimburses you for the cost of Medicate Part "B". there is no additional cost to you for Medicare Part "A" when you become eligible for the coverage. The Company provides a Medicare supplement which extends over and above the entire cost of the Medicare supplement.

Coverage for your spouse and/or any eligible dependent(s) will be provided.

Your medical insurance coverage will be for your life. Your spouse and/or eligible dependents will be covered for 12 months after your death. At the end of the 12 months, your spouse and/or eligible dependents will be offered continuation of coverage through COBRA.

B. Dental Insurance
Since you were age 40 and had 12 or more years of employment as of January 1, 1993, you will be covered by the Company sponsored dental plan at your Actual Retirement Date.

You will pay 10% of the current premium (the premium in effect as of the first of the year in which you retire) from age 55 to age 62. When you reach age 62, the Company will pay the entire premium.

Coverage for you spouse and/or any eligible dependent(s) will be provided.

Your dental coverage will be for your life. Your spouse and/or eligible dependents will be covered for 12 months after your death. At the end of the 12 months, your spouse and/or eligible dependents will be offered continuation coverage through COBRA.

The document also included the following statement:

9. Plan Documents
...
This summary is not intended to offer detailed descriptions of employee benefit plans. All information furnished is governed by the provisions of the actual plan documents. If a conflict arises between this summary and the System's employee benefit plan documents, or if any point is not covered, the terms of the appropriate plan documents will govern in all cases.

The personalized information given to the plaintiffs contained no reservation of rights and did not identify any circumstances which might result in disqualification, ineligibility, or denial or loss of benefits, as is required of a summary plan description (SPD) under ERISA, 29 U.S.C. § 1022.

Plaintiffs Balestracci, Carr, Comeau, Hunt, Quinton, Socha and Whitlock accepted the company's 1997 PRP, in reliance on the benefits set forth in Exhibits A and B, including the promise of lifetime health and dental benefits for them and their spouses and eligible dependents. They executed releases of claims against the company. (PSt 4-6)

After they had elected to participate in the PRP and had executed releases, the plaintiffs who retired in 1997 received a document of 264 pages, entitled "Participant

4

Benefit Information. The 264 page document was a series of summary plan descriptions (SPDs) for the Employee Savings Plan, the Master Medical Plan, the Blue Choice Plan, the Medex Plan, the Dental Blue Plan, the Life Insurance Plan and the Pension Plan. NStar has claimed that the 1997 and 1999 retirement incentive programs were qualified and limited by this and similar documents. At page DB 33 of the Dental Blue Plan, under the heading, "Your Rights," the following text appears:

> This section describes the Dental Blue Program 2 in general. If any conflict arises between this document and the Plan document, or if we do not cover any point, the terms of the Plan Document will always govern.
>
> The Company reserves the right, subject to the provisions of any collective bargaining agreement, to amend, modify or terminate the Plan at any time.
>
> Please refer to the Administrative Information section for all information related to the administration of this Plan.

(PSt, Exh. E) At no time during their meetings with company's human resources representatives was any mention of possible cancellation of lifetime benefits. At no time did any of the representatives direct attention to the dental SPD that included the above statement. (PSt ¶¶ 7-9)

2. <u>The 1999 Voluntary Separation Program.</u> In 1999, in anticipation of the merger of Commonwealth Energy System and Boston Edison to form NSTAR Electric and Gas Company, there were "redundancies" that the company wished to address. It wanted to "reduce its [work] force on a voluntary basis as much as possible. In the summer of 1999 the company distributed to its employees a document entitled "Com/Energy – Boston Edison 1999 Voluntary Separation Program – Program Summary." (PSt, Exh. C) The document contained the following information concerning health and dental coverage:

<u>Health Coverage</u>

Your medical, dental and vision care coverage, if applicable, end following your separation of service with the company. You may, however, elect to continue these coverages for a period of 18 months thereafter under COBRA ... Under COBRA continuation, you are required to pay the full cost of coverage plus an additional administrative expense.

...

· If you are eligible for post-retirement medical, dental and life insurance coverages, you will receive information from Human Resources-Benefits at the time of your termination.

Plaintiffs Bonville, Connelly, Corcoran, Dearn, Eldridge, Fletcher, Hawkesworth, Lawrence, Lopes, Mann, Meyn, Nickerson, Owens, Rene and Watts were eligible for post-retirement medical, dental and life insurance coverage by virtue of their ages and years of service. They met with a human resources representative and were given documents entitled "Information Relative to Employee Benefits Upon Termination of Employment." (PSt, Exh. E) These documents were identical in relevant parts to the 1997 personalized documents, supra at pages 2-3, including the promise of life time dental benefits for the retiree and an additional year for his/her spouse. The document, like the 1997 personalized documents, contained no reservation of rights by the company and no language indicating a possibility of cancellation, modification or termination of the lifetime health and dental benefits.

At no time in the meetings with the company's human resources representatives were the 1999 VSP plaintiffs informed in any way that the promised lifetime dental insurance could be cancelled or changed. At no time was there mention of any provision in a dental benefits document that would allow the company to terminate the promised lifetime dental benefits. (PSt ¶ 14)

Bernard Peloquin is the Director of Total Compensation at NStar. From 1993 to the merger with NStar he was manager of employee benefits for Commonwealth Gas Company and the Commonwealth Energy System Companies. Testifying in a Rule 30(b)(6) depositions on behalf of NStar in a related case brought on behalf of union employees at Commonwealth Gas, he stated that the personalized documents given to employees in connection with the 1997 and 1999 voluntary retirement programs were general forms, customized for the individual employee's situation. The purpose of these documents, he stated, was "to try to summarize at a high level the benefits that [the employees] may be eligible for under the particular plans and plan documents," containing "certain elements of those plans to make it easier for them to review." But the company, Peloquin testified, reserved the right to modify or amend the plans under the provision buried in the 264 page document given employees after they retired, like that sent employees in 1997 after they retired. (PSt ¶ 16)

Asked why the company stated 1997, for the first time in documents given to prospective retirees, that dental coverage would be for their lifetimes and for their spouse and eligible dependents for 12 months after the employee's death, Peloquin stated:

> A. Well, the intent of this document was just to provide a brief summary of all of the employee benefit plans. They were not intended to be a detailed description of the employee benefit plans, and they can't be read in isolation of the other documents. ... [The statement of lifetime benefits] was accurate as of that particular point in time, but the company did retain the right to make changes in those plans ... It was applicable – it was for your life at that particular point in time, but it was subject to the plan documents and the company's ability to make changes. (PSt ¶ 16)

Since 1973 the health and dental group insurance benefit plans for employees of Commonwealth Gas Company have been changed from time to time. The company has

7

added plans, changed benefits, changed insurance carriers, changed individual benefits provided in the plans and changed employee co-payments. In the mid-1990s the company changed dental benefit providers from Delta Dental to Dental Blue. (PSt ¶ 18) An affidavit of Carol S. Chandor, an expert in insured employee medical and dental plans, states that the medical and dental summary plan descriptions used by Commonwealth Gas Company in recent years are typical. In preparing SPDs, Massachusetts health and dental providers typically include a provision allowing the plan sponsor (the employer who provides and purchases the benefits for employees and retirees) to terminate coverage at any time. Employers regularly review their plans, plan designs and levels of service and may change providers, while continuing health insurance coverage for their employees and retirees.

**Argument**

I. THE 1997 AND 1999 VOLUNTARY RETIREMENT PROGRAMS ARE WELFARE BENEFIT PLANS UNDER ERISA

The 1997 and 1999 retirement plans are "welfare benefit plans" under ERISA. In Wickman v. Northwestern Nat. Ins. Co., 908 F.3d 1077 (1 Cir. 1990) the court quoted the oft-cited criteria set out in Donovan v. Dillingham, 688 F.2d 1367 (11th Cir. 1982): "In summary, 'a plan, fund or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of funding, and procedures for receiving benefits." 688 F.2d at 1373. The Donovan court set out five essential elements: "(1) a plan, fund, or program (2) established or maintained (3) by an employer or by an employee organization, or by both

8

(4) for the purpose of providing medical, surgical, hospital care ... (5) to participants or their beneficiaries." Id., at 1370. The 1997 and 1999 plans meet these criteria.

In O'Connor v. Commonwealth Gas Co., 251 F.3d 262 (1Cir. 2001) the Court of Appeals ruled that the 1997 PRP was not an ERISA plan. That case involved a suit by two retired employees who retired before the 1997 plan was announced. They claimed that they were misled into retiring before the effective date of the PRP. The Court of Appeals ruled that the PRP was not an ERISA welfare benefit plan; therefore the company owed no fiduciary obligation to the employees. In O'Connor the court viewed the severance bonus in the as "the meat and potatoes of the [1997] plan." Id., at 267. The court regarded the "other elements of the PRP – educational assistance, pension credit, and COBRA premiums [as] ... little more than afterthoughts to the severance bonus. Compared to the severance, they would not likely have factored significantly into an employee's decision to retire early." Id., at 268.

This case is far different because unlike Mr. O'Connor, who evidently did not qualify for the *lifetime health and dental benefits* promised the plaintiffs in this case.[3] In these days of rapidly rising health and dental costs, lifetime health and dental benefits have far greater value to an employee and his spouse than a fully taxable, one-time severance bonus. The security of lifetime health and dental benefits far outweigh the value of the one-time severance pay offered by the Company. There can be no question that lifetime health and dental coverage fall well within the definition of an ERISA plan.

---

[3] The opinion indicates that O'Connor would have received only payment of COBRA premiums for twelve months. Id., at 270.

9

## II. NSTAR VIOLATED THE PLAN BY TERMINATING LIFETIME DENTAL COVERAGE FOR PLAINTIFFS AND THEIR SPOUSES

Welfare benefits plans, unlike pension benefit plans, are not automatically vested for life. But it is well-settled that an employer may design a plan that provides welfare benefits for the life of a retiree. In this case it is clear that Commonwealth Gas, in its effort to reduce its payroll and save millions of dollars in payroll costs, consciously decided to promise participants in the 1997 and 1999 severance programs that they and their spouses would have dental coverage for their lives. It was a powerful inducement.

The employees were given two documents with information about the 1997 PRP. The first, the 1997 Personnel Reduction Program document (PSt, Exh. A) strongly suggested lifetime coverage. Employees who were age 40 and had 12 years of service as or January 1, 1993 and currently satisfied the Rule of 75 "will be entitled to medical and dental coverage providing they pay ten percent (10%) of the current medical and dental premium until age sixty two (62). At age 62 the company will pay 100% of the premium." Then, in personalized documents given to prospective retirees the company used the words "will be for your life" in describing the health and dental benefits that would be provided for those who decided to retire. "For your life" means just that. It does not mean "for your life unless the Company decides to change it," and the ordinary employee will quickly see and understand the difference. The personalized documents were carefully drawn. For medical insurance benefits the Company raised a "red flag" concerning Medicare Part B reimbursement: "*Currently* the Company reimburses you for the cost of Medicare Part "B." (emphasis supplied) There was no such cautionary language related to lifetime dental coverage. The personalized documents given to the prospective retirees were obviously intended to be the primary focus of employees'

10

attention when they weighed the advantages and disadvantages of retiring. They explained exactly what the employee himself or herself would receive.

The 1999 VSP was virtually identical to the 1997 document. In 1999 there was a program booklet that satisfies the formal requirements for an ERISA SPD, 29 U.S.C. § 1022. There is scant reference to health and dental benefits. At page 4 one bullet point informs the employee: "If you are eligible for post-retirement medical and dental coverage, you will receive information from Human Resources-Benefits at the time of your termination." At page 8, Appendix A it is stated that dental and medical coverage under COBRA is paid only through the end of the month of termination. A further short statement says: "For those employees who are eligible for post-retirement medical/dental coverage: Coverage will continue to employee and eligible dependents. Certain employees might be responsible for co-payment of premiums." Again in 1999 the focus of the Company's offer to the employee was the personalized "Information Relative to Employee Benefits Upon Your Retirement Date, Prepared for [Employee's name]" that was identical to the 1997 plan in providing that. "Your dental coverage will be for your life."

It is crucial to note that the promise of dental coverage for life was not attached to any specific dental plan or dental provider. The Company promised lifetime coverage, not lifetime coverage under any particular policy. The difference is highly significant. In United Steelworkers v. Newman-Crosby Steel, 822 F.Supp. 862 (D.R.I. 1993), the company, in contesting a lifetime benefit claim, pointed to an SPD that allowed the policy to be terminated. The court responded: "The Court does not find these documents persuasive ... First, the brochures merely describe the coverage purchased by the

11

Company to fulfill its obligation under [the CBA]. They cannot and do not modify that obligation. The fact that the policy the Company chose to purchase may be terminable does not make the Company's duty to provide life insurance benefits terminable." Id., at 865. See also, In re Consolidated Mutual Life Insurance Co., 77 N.Y.2d 144 (N.Y. 1990), where the court construed a general right to terminate clause in a health insurance policy as only affecting the relationship between the employer and the insurer, and did not allow the employer to terminate coverage. The opinion of Carol S. Chandor, an expert in insured employee medical and dental benefit plans, shows that Massachusetts health and dental group insurance policies typically allow the plan sponsor (the employer which pays for the insurance coverage) to cancel the policy. Employers change policies and change insurance providers from time to time (as Commonwealth Gas has done over the years). The fact that the employer can terminate a particular policy -- where others are available – is not inconsistent with a promise to provide dental coverage for the life of the employee. Commonwealth Gas knew about disclaimers and reservations of rights, and it could have qualified the lifetime promise, as it did for Medicare Part B reimbursement, but it did not do so.

In construing ERISA plan documents, courts apply common sense canons of interpretation. Pizzzuti v. Polaroid Corp., 185 F.2d 12, 16 (1st Cir 1997), GCIU Employer Retirement Fund v. Chicago Tribune Co., 66 F.3d 862, 865 (7th Cir. 1995) ("we will give contract terms their 'ordinary and popular' sense and avoid resort to extrinsic evidence when faced with unambiguous language.") The ordinary employee reading the personalized document would give the words their normal meaning: The employee pays

10% of the current dental premium to age 62, after 62 the company pays the entire premium, and "your dental coverage will be for your life." There is simply no ambiguity.

NStar asks the Court to rule that the lifetime benefits were not for the life of the retiree because the dental insurance policy SPD that it used at the time contained a provision allowing the Company to terminate that particular policy. As we have shown, that language, buried in a 264 page series of a collection of SPD's, is not inconsistent with the Company's promise of lifetime dental coverage because the Company did not promise the retiree any particular dental provider or policy. The Company may, as it has in the past decades, continue coverage with a different policy or a different provider, as long as the benefits are maintained for the retiree's lifetime. In any event, no reasonable employee would work his way through that book to understand his/he rights under the Company's retirement offer.

The Company had "a fiduciary duty as a plan administrator not affirmatively to mislead participants. ...Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." "[I]n the exercise of his duties, the fiduciary may not materially mislead those to whom the duties of loyalty and prudence are owed." "Put simply, when a plan administrator speaks, it must speak truthfully." <u>Center v. First International Life Ins. Co.</u>, 1997 WL 136473 (D. Mass/ 1997) (internal citations omitted) These cases are relevant to a suit under § 1132(a)(1)(B) because the employees may reasonably expect that their employer will be straightforward and not devious in presenting the terms of an early retirement proposal and its insurance components. It is not reasonable to expect an employee, without notice, to read all of the 264 pages of the several insurance policies in order to understand the employer's

separation offer. "[I]f a participant has to read and understand the policy in order to make use of the summary, then the summary is of no use at all." Hansen v. Continental Life Ins. Co., 940 F.2d 971, 981-982 (5th Cir. 1991). "[T]he statue contemplates that the summary will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary. To allow the Plan to contain different terms that supersede the terms of the booklet would defeat the purpose of providing the employees with summaries." Heidgerd v. Olin Corp., 906 F.2d 903, 907-908 (2nd Cir. 1990). "It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonable relying on the summary booklet." McKnight v. Southern Life and Health Ins. Co., 758 F.2d 1566, 1570 (11th Cir. 1985). We understand that the courts in these cases have dealt with summary plan descriptions, and that the personalized documents given the employees in this case do not meet the formal requirements of an ERISA SPD. But the point is the same. In fact, the individualized documents are designed to and in fact do say to the employee that the Company has looked at your situation and here is what you will get if you retire.

In some cases the document promising health or dental insurance "for life" has no reservation of rights, but the employer has relied on another document which has prominent reservation of rights language. In such cases courts will normally look only to the document which promises lifetime benefits, unless that document is an amendment to another agreement of policy, or unless the employee's attention is specifically directed to the document with the reservation of rights. In Diehl v. Twin Disc, Inc., 102 F.3d 301 (7th

Cir. 1996) a shutdown agreement unambiguously and explicitly granted health insurance and life insurance "for the lifetime of the pensioner." The employer argued that the shutdown agreement incorporated, by its own terms, an insurance agreement, which in turn incorporated the reservation of rights language in insurance booklets. The court rejected that argument and said, 102 F.3d at 306-307:

> We respectfully do not believe that the Shutdown Agreement can be read to have incorporated unmodified the "change or discontinue" language contained in the insurance booklets. What the interpretation urged by [the employer] ignores is that the Shutdown Agreement itself was an independent contract, supported by separate consideration and capable of modifying or supplanting prior contractual arrangements.
> It is true than when potentially conflicting provisions coexist within the same document, or within a single contract formed of several documents, the rule that contractual provisions be read as integrated parts of an integrated whole will lead a court to seek an interpretation that reconciles those provisions. See, In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 58 F.3d 896, 904 (3rd Cir. 1995). ...
> This is not true for the Shutdown Agreement, which unambiguously granted lifetime benefits to the retirees and then referred to the 1983 agreements for the purpose of identifying their level of benefits. The Shutdown Agreement was not executed in temporal proximity to either the 1983 Insurance Agreement or the preceding insurance booklets, nor did the Shutdown Agreement share with this earlier agreement a common underlying consideration.

Compare, Vallone v. CNA Financial Corp., 375 F.3d 623 (7th Cir. 2004) (the VSRP plan was an amendment of the retirement plan, which contained a reservation of rights clause) and UAW v. Rockford Powertrain, Inc., 350 F.3d 698, 704 (7th Cir. 2003) (lifetime benefits granted in same document with reservation of rights clause). Finally, in Deboard v. Sunshine Mining & Refining Co. 208 F.3d 1228 (10th Cir. 2000), amended 2000 U.S. App. Lexis 8639 (2000), the court upheld retirees claims for lifetime benefits under a retirement plan that did not include a reservation of rights clause, although other retirement plans has included such a provision.

15

Here the 1997 and 1999 retirement plans were new and different retirement incentive programs. They were separate and apart from normal retirement under existing employer policies. Commonwealth Gas received new and separate consideration in these plans, because its payroll costs were substantially reduced without the employee demoralization that results from layoffs and job elimination. The personalized documents given to the employees by Commonwealth Gas to describe the program unambiguously promised lifetime dental coverage for the employee and, for the employee's spouse, for the life of the retiree and an additional year. The dental SPD was not part of the plan. It was not referred to in the plan. It was simply the means then used by Commonwealth Gas to provide the coverage.

If the Court should find that the 1997 and 1999 plans were not ERISA plans, the plaintiffs are entitled to relief under state law of contract and estoppel. "The theory of promissory estoppel, as embodied in the Restatement of Contracts § 90 (1932), permits recovery if (1) a promisor makes a promise which he should reasonable expect to induced action or forbearance of a definite and substantial character on the part of the promise, (2) the promise does induce such action or forbearance, and (3) injustice can only be avoided by enforcement of the promise." Loranger Construction Corp. v. E.F Hauserman Co., 6 Mass. App. Ct. 152, 154 (1978), aff'd. 376 Mass. 757 (1978), Rhode Island Hospital Trust Nat. Bank v. Varadian, 419 Mass. 841, 849 (1995) ("an action based on reliance is equivalent to a contract action")

Accordingly, if the claim of the plaintiffs are not cognizable under ERISA, the Court should enforce the Company's promise of lifetime dental coverage under Massachusetts contract and promissory estoppel law.

## Conclusion

Plaintiffs have established, by undisputed facts, that NSTAR violated the terms of the 1997 and 1999 voluntary retirement plans for employees of Commonwealth Gas when it declared in early 2003 that employees who retired under those agreements and their spouses would not have dental insurance if they had not reached age 65 by April 1, 2003. The Court should grant plaintiffs summary judgment. NSTAR should be ordered to make the plaintiffs whole for their losses and restore their dental benefits for their lifetimes and for their spouses and eligible dependents for an additional year after the retiree's death.[4]

Respectfully submitted:

LOUIS BALESTRACCI, et als.,
By their attorneys,

_____
Warren H. Pyle, BBO # 408400
Pyle, Rome, Lichten, Ehrenberg
    & Liss-Riordan
18 Tremont Street, Suite 500
Boston, MA 02108
Tel: (617) 367-7200

Dated: March 4, 2005

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon all counsel of record, by hand delivery, on March 4, 2005.

_____
Warren H. Pyle

---

[4] Courts award retroactive benefits and the reinstatement of benefits. See, e.g., Canseco v. Construction Laborers Pension Trust, 93 F.3d 600, 610 (9th Cir. 1996) (ordering retroactive retirement payments); Govindarajan v. FMC Corp., 932 F.2d 634, 636 (7th Cir. 1991) (upholding district court's order of retroactive reinstatement of benefits); Mine Workers v. Nobel, 720 F.Supp. 1169 (W.D.Pa. 1989) (ordering retroactive and prospective benefit payments), aff'd. mem. 902 F.2d 1558 (3d Cir. 1990), cert. denied, 499 U.S. 904 (1991).

17