Page 1

1                                    Volume: I

2                                    Pages: 1 - 102

3          UNITED STATES DISTRICT COURT

4            DISTRICT OF MASSACHUSETTS

5              C.A. No. 03-10530-EFH

6

7

8   UTILITY WORKERS, LOCAL 369, ET AL,

9           Plaintiffs,

10      v.

11  NSTAR ELECTRIC AND GAS CORPORATION,

12          Defendant.

13

14

15              **********

16        DEPOSITION OF DONALD GRAHAM

17        Monday, December 22, 2003

18              Radisson Hotel

19              180 Water Street

20          Plymouth, Massachusetts

21                9:55 a.m.

22        Reporter:  Linda M. Grieco

23    320 Congress Street, Boston, MA 02210

24

Page 2

1  APPEARANCES:
2
3  SEGAL ROITMAN & COLEMAN
4  (By Paul F. Kelly, Esquire
5  and Stephanie R. Pratt, Esquire)
6  11 Beacon Street
7  Boston, Massachusetts 02108
8  on behalf of the Plaintiffs
9  (617) 742-0208
10
11  MORGAN, BROWN & JOY
12  (By Keith Muntyan, Esquire)
13  One Boston Place
14  Boston, Massachusetts 02108
15  on behalf of the Defendant
16  (617) 523-6666
17
18
19
20  Also Present: Bernard B. Peloquin, NStar
21
22
23
24

Page 3

1           INDEX
2  Deposition of:    Direct  Cross
3  DONALD GRAHAM
4    By Mr. Muntyan    4
5    By Mr. Kelly          59
6
7
8
9
10         EXHIBITS
11  No.                         Page
12  1  Information on Employee Benefits
13     Package for Suzanne Dupont      22
14  2  Information on Employee Benefits
15     Package for Vincent Crowley     22
16  3  Master Medical Summary Plan
17     Description                     43
18
19
20
21
22  Exhibits Retained by Mr. Muntyan
23
24

Page 4

1           PROCEEDINGS
2           STIPULATION
3        It is stipulated by and between counsel
4  for the respective parties that the deposition is to
5  be read and signed by the deponent under the pains
6  and penalties of perjury; and that the sealing and
7  filing thereof are waived; and that all objections,
8  except as to form, and motions to strike are
9  reserved to the time of trial.
10           * * * * *
11        DONALD GRAHAM,
12  a witness called by counsel for the Defendant, being
13  first duly sworn, was examined and testified as
14  follows:
15         DIRECT EXAMINATION
16         BY MR. MUNTYAN
17     Q. Mr. Graham, my name is Keith Muntyan. I
18  represent NStar in this litigation. Thank you for
19  coming in so we could ask you about your
20  recollections and understandings of some of the
21  events that this case touches on. There's some
22  ground rules for the deposition that have been I
23  think satisfactory in the past, and I want to
24  outline them to you. The first is unlike normal

Page 5

1  conversation where we nod our head or shake our
2  head, we need to talk out loud so the court reporter
3  can write it down, because she'll be taking down
4  whatever we say here. So if you revert to acting
5  like a normal person and nod at something, I'll say
6  is that a yes or shake your head, I'll say is that a
7  no. That's what I'm trying to do is get an actual
8  spoken response for the record. Also, unlike normal
9  conversation, we can't talk at the same time, which
10  we all do in real life. But if we do it here, it
11  makes it hard to sort out the threads on the
12  transcript. So I'll try not to come back with
13  follow up until you've finished your answer. If
14  you'll try to let me finish my question, even if you
15  know exactly where I'm going, before you say your
16  yes, no, maybe or otherwise, that will help. If you
17  don't understand any question that I put to you,
18  please just say so is fine. I'll try it again and
19  try to make it clearer. No need to try to answer a
20  question that you don't understand, and I prefer
21  that you not. Just let me know I didn't get it
22  clear, and I'll improve with practice and get it
23  clear. You're welcome to take a break any time you
24  want. If there's a question that I ask, I'd

2 (Pages 2 to 5)

Page 22

1  MR. MUNTYAN: Why don't we be off the
2  record for a minute so Mr. Kelly can have a look.
3  (Pause)
4  (Exhibits 1 and 2 marked for
5  identification.)
6  (Documents exhibited to witness.)
7  Q. Mr. Graham, I've put before you two
8  documents that we've marked as Exhibits 1 and 2 to
9  your deposition. Do you recognize that type of
10  document? I'm not asking whether you remember the
11  specific individuals and the data applicable to them
12  in particular, but rather the type of document that
13  is Exhibit 1 and 2.
14  A. Yes.
15  Q. Was it your practice at ready-or-not
16  sessions to have documents like Exhibits 1 and 2
17  available for employees? Were those part and parcel
18  of a ready-or-not session or are those separate, is
19  what I'm trying to get at?
20  A. I don't believe these were part of the
21  documents at ready-or-not. I think we would have
22  provided for the ready-or-not sessions the pension
23  numbers.
24  Q. So if I were an employee and I came to a

Page 23

1  ready-or-not, I would probably -- and I'm talking
2  now and for the rest of the deposition about
3  ready-or-nots that happened once you were involved
4  with them, not those that happened before you were
5  ever involved.
6  A. Uh-hum.
7  Q. I might expect to get some sort of document
8  that showed me my own specific projections or what
9  my pension benefits would be?
10  A. Yes.
11  Q. When in my employment might I expect, if
12  ever, to get a document like Exhibit 1 or Exhibit 2?
13  A. You could expect to receive a document like
14  this when you gave us your intention of retirement.
15  Then we would put this together and have it
16  available for when you came for your exit interview.
17  Q. Is it fair to say that people attending the
18  ready-or-not sessions were invited to those sessions
19  by the company?
20  A. Yes.
21  Q. What was the basis on which the company
22  would select folks to extend an invitation to them
23  to attend a ready-or-not?
24  A. Their eligibility for retirement. They were

Page 24

1  probably at least age 50 and probably did have the
2  Rule of 75, which would entitle them to retirement.
3  Q. So they could at least be considering it?
4  A. Right.
5  Q. Okay. And --
6  A. We would probably -- excuse me.
7  Q. Please.
8  A. We would probably -- those people who were
9  age 55 with the Rule of 75, we would definitely want
10  to go to ready-or-not. We would work backwards.
11  You might be 54, you might be 53. We probably draw
12  the line at 50. Because there were so many
13  participants over the age of 50 who either had the
14  Rule of 75 or were approaching the Rule of 75, we
15  would concentrate on those individuals, because,
16  yeah, they did have requirements for retirement, and
17  that they might be first to retire. So we'd want to
18  focus in on those folks.
19  Q. At the ready-or-not sessions that you
20  attended once you became supervisor, was Carol
21  Cormier typically present for the Commonwealth Gas
22  folks at ready-or-nots you attended?
23  A. Yes.
24  Q. Were there also individual counselling

Page 25

1  sessions with employees before they actually
2  retired?
3  A. Yes.
4  Q. Is that what you referred to a moment ago, I
5  think, in the nature of an exit interview?
6  A. Yes.
7  Q. At the ready-or-not sessions, in addition to
8  folks finding out what their pension numbers were
9  estimated to look like if they retired at a
10  particular point, did they get information about
11  other subjects?
12  A. Yes.
13  Q. Can you identify some of those? What else
14  might they hear about?
15  A. They would hear about replacement income at
16  retirement, which would be pension. They would hear
17  about employee savings plan, what happens to your
18  employee savings plan. They would hear about health
19  insurance, life insurance. They would -- we would
20  provide outside information relative to financial
21  planning. We would give them, have available for
22  them information on -- we would bring in a doctor,
23  medical doctor who would go over the pitfalls of
24  retirement, if you will. We would have employee

7 (Pages 22 to 25)